## GILBERT v. CHASE NATIONAL BANK.

## CHASE NATIONAL BANK OF CITY OF NEW YORK v. FEDERAL RESERVE BANK OF NEW YORK.

## FEDERAL RESERVE BANK OF NEW YORK v. FIRST NATIONAL BANK OF BOSTON.

United States District Court
S. D. New York.

Oct. 22, 1952.

Joshua J. Nasaw, New York City, for plaintiff. Caesar L. Pitassy, New York City, of counsel.

Maurice & McNamee, New York City, for Chase National Bank. Stewart Maurice, New York City, of counsel.

Walter S. Logan, New York City, for Federal Reserve Bank of New York. John J. Clark, and Alfred L. Pitts, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for First National Bank of Boston. J. Joseph Noble, and Alfred J. Morgan, New York City, and Joseph H. B. Edwards, Boston, Mass., of counsel.

IRVING R. KAUFMAN, District Judge.

This action, as I see it, is one to recover funds which the plaintiff claims the defendant, The Chase National Bank, illegally paid out of his account. The funds were paid out on the basis of a check, which is now marked Exhibit 1, and the litigation revolves about that check.

This check was drawn by the plaintiff on his funds in The Chase National Bank in the amount of $50,000. The check was dated March 14, 1946, and it named the Snowden Oil & Gas Company, Ltd., as payee. Shortly thereafter it was paid by The Chase National Bank and the plaintiff's account debited accordingly.

It is agreed for the record that on or about April 1, 1946, the check was returned to the plaintiff in cancelled form, together with his March bank statement. Not until more than two years later did the plaintiff protest, as he says, orally to an official of the bank that the check had been improperly paid and, as he says, demanded the return of $50,000. The action however, upon the alleged improper endorsement and payment which resulted from it, was not instituted until May 1951.

The Snowden Oil & Gas Company, Ltd., was a limited partnership organized under the laws of Texas and was engaged in drilling operations in Oklahoma. The plaintiff, before this transaction, had invested $10,000 in one of its enterprises through the investment firm of A. W. Smith & Company of Boston, and I think Mr. Gilbert on the stand so testified. This firm was represented by A. W. Smith, and I believe Mr. Gilbert added, by Mr. Carr as well. Thereafter discussions arose between

the plaintiff and Smith concerning additional investment, as a result of which the plaintiff invested $50,000 in this new enterprise, which he calls deal No. 2. The plaintiff, thereupon, sent the check in suit to A. W. Smith & Company in payment for his share of the venture. One J. Dudley Clark, a limited partner in Snowden Oil & Gas Company, Ltd., and F. C. Hernberg, of the investment firm of Augustine & Company, whose company was also interested in Snowden Oil & Gas Company, Ltd., signed their own names to the back of this check, and the check was then turned over to The First National Bank of Boston. A representative of The First National Bank of Boston then wrote on the back of the check "Wired to Fredonia," and caused the check to be stamped "Credited Account of the Within Named Absence of Endorsement Guaranteed by First National Bank of Boston." The proceeds of the check were ultimately credited by wire and telephoned to Snowden's account in the Fredonia Valley Bank.

It is clear, therefore, that with these inscriptions on the check there were absent the words "Snowden Oil & Gas Company, Ltd." by way of endorsement. Although there has been no concession with respect to this fact, I find without reservation that the proceeds of this check were credited to the Snowden account in the Fredonia Valley Bank as above indicated. I am led to this conclusion by reason of the following facts:

(1) There is not any indication in this case that Snowden ever complained that he or his company had not received the funds.

(2) The plaintiff had received a receipt from A. W. Smith & Company, which is in evidence.

(3) Plaintiff received various drilling contracts and oil leases from Snowden.

(4) Between March 1946 and approximately May 1950 he received by way of return over $10,000 in cash, which the plaintiff said he credited to deal No. 2.

(5) In May or June 1950 he assigned his interest in deal No. 2 to the Texmass Oil Company, later known as the Consolidated Texas Oil Company, and in exchange for this assignment he received a check which he included in the total sum which he stated he received from Snowden and the following securities of Texmass:

| | |
|---|---|
| Common stock (Voting Trust Certificate) | 4.4289 shs. |
| Senior 4½% Debentures | $7,560. |
| Junior 5% Debentures | $5,985. |
| Class B Preferred Stock | 161.7 shs. |

He did not recall whether he had received Class A common stock.

We must not, therefore, overlook the fact that the plaintiff between the years of 1946 and 1950 took advantage of liberal deductions allowed oil investors in his income tax returns. Furthermore, while the cancelled check was in the possession of the plaintiff from on or about April 1, 1946, no oral complaint was made until the latter part of 1948, and no suit was begun until May 1951. In short, this seems like a case in which the plaintiff, being unhappy over his investment, as an afterthought decided that because of the absence of the words "Snowden Oil & Gas Company, Ltd." on the reverse side of the check, he would press this suit against the drawee bank.

The plaintiff contends that this is not a case of an authorized endorsement or an unauthorized endorsement, but that this is a case of no endorsement. We will accept for the purposes of this case plaintiff's contention, particularly in view of the concession by the defendants that the element of authorized endorsement has been taken out of the case by virtue of their decision not to present any proof with respect to the authority of Clark and Hernberg and the First National Bank of Boston concerning the endorsements.

Now, on this theory the question remains whether the bank is in some way liable to the plaintiff for its failure to obtain endorsement of the payee because the plaintiff might have asserted certain defenses against the payee. From the evidence it quite clearly appears that the asserted defenses were never raised by the plaintiff at or about the time the check was paid in regular order into the account of the Snow-

den Oil & Gas Company, Ltd. and a cancelled check returned to the plaintiff.

The plaintiff's offer of proof indicates that it is his contention that there were material representations made by Smith which were fraudulent and were relied upon by the plaintiff in the purchase of the securities involved in deal No. 2. No such charge is made with respect to the other transaction with Snowden and Smith, namely, deal No. 1.

I have already found that the funds were paid into the account of the named payee of the check in issue. It is quite clear that the plaintiff never attempted to stop payment on this check before it was paid. It is also clear, as I have already stated, that he did not protest the payment made by the bank until more than two years after it had been paid. The First National Bank of Boston was not a holder of the check, but it was merely the agent of Snowden in its collection. For example, if Snowden had endorsed the check so that the funds could be credited through various intermediate banks to Snowden's account in Fredonia, and the plaintiff had ordered the check stopped because of equities existing between him and Snowden, the First National Bank could not have enforced payment against the plaintiff as maker, unless Snowden had already drawn on the Funds credited to it by First National. Cf. Freeport Bank v. Viemeister, 1929, 227 App. Div. 457, 238 N.Y.S. 169.

Thus, as I see it, the case stands in exactly the same. position as it would have been had the check been paid directly by Chase instead of through the First National Bank via the Federal Reserve System.

It is conceded by all of the parties that if Snowden's endorsement had been obtained, that is, if the words "Snowden Oil & Gas Company, Ltd." had been inscribed on the reverse side of the check, the plaintiff could not on any possible theory obtain recovery against The Chase National Bank in this case. In passing, I comment upon this fact: Aside from the apparent general dissatisfaction of the plaintiff over the manner in which the Snowden Oil & Gas Company deal No. 2 finally turned out, I could not say with any conclusiveness that the plaintiff has finally and definitely suffered any loss, even if this were a relevant factor in the case, which I do not believe it is. He has received return on his investment exceeding $10,000. He still owns securities in the Texmass Oil Company, presently known as the Consolidated Texas Oil Company, which is still a going concern. He has taken advantage of the liberal tax deduction features allowed oil investors in their income tax returns. Moreover, it does not appear that the failure to obtain the endorsement contributed to the plaintiff's loss, if in fact one occurred.

However, let us pass on to the more important features of the case. Let me say first that there is nothing sacred about an endorsement on a check. Indeed, Section 79 of the Negotiable Instruments Law, McK.Consol.Laws, c. 38, recognizes this. And in the case of Osborn v. Gheen, 1886, 16 D.C. 189, at page 194, affirmed, 1889, 136 U.S. 646, 10 S.Ct. 1072, 34 L.Ed. 552, a case quite in point, the Court stated:

> "The Court was also entirely right in directing the allowance of the check for $1,925, which was paid by the bank, although it was not endorsed by the payee. There is no necessity at all for the legal operation of a payment that the payee should endorse the paper. All that he has to do is to receive the money. The party to whom it is directed is ordered to pay so much money to him.

> "All that the drawee has to do, therefore, is to satisfy himself that when the order is presented the true and proper person is there at hand to receive the payment and to receipt for it. It is true it is common for the payee to endorse in blank at the bank, or for the holder of an instrument to endorse in blank when he receives payment, as a voucher for the payment.

> "But a voucher is not necessary, nor is a receipt necessary to give validity to a payment. The bank makes the payment, of couse, at its peril, if the payee shall afterwards challenge the payment and say the money was not paid to him, but to somebody else.

Then it is a mere question of identity as between the payee and the bank; but it does not go to the legal integrity of the instrument.

"The bank upon whom the note or bill of exchange is drawn is authorized and required to pay the money to the payee, knowing him to be the identical man indicated, without any endorsement and without any receipt."

The plaintiff cites the case of Lynch v. First National Bank of Jersey City, 1887, 107 N.Y. 179, 13 N.E. 775, and the Sundail Construction Company v. Liberty Bank, 1938, 277 N.Y. 137, 13 N.E.2d 745. He relies heavily upon these authorities for recovery.

In the Lynch case, one Wilder had made a check drawn on the defendant payable to himself or his order. In that form he had the check certified. Thereafter, without endorsement, the check came into the hands of the plaintiff Lynch by means which do not appear. Lynch brought suit against the drawee bank to compel payment of the check. In holding that the bank could not be forced to pay the check under such circumstances, the Court used the following language, some of which was later quoted in the Sundail case:

"The bank's protection in the payment of checks consists in the fact that it has followed strictly the depositor's directions in disbursing his funds. Where a depositor has imposed *the condition* that *his* check shall not be paid without it bears *his* indorsement, the depository, if it pays it to a holder without such indorsement, runs the risk of the transaction, and takes the burden of showing that *such holder has acquired in some way the lawful title to receive the funds*. It may successfully defend such a payment, if it can show that it made it to a person who, as against the drawer, was legally entitled to receive it, for in that event the drawer would suffer no damage thereby." (Emphasis added.) [107 N.Y. 179, 13 N.E. 777.]

Several features distinguish this case from the one at bar. First, the case must be considered in the light of the well known principle of the law of negotiable instruments that a check wherein the payee is also the maker is not "issued" until endorsed by the maker. Thus, until the check was endorsed by the maker the depositor had given no directions to the drawee bank to pay out his funds to *anyone*. This is the condition referred to in the above excerpt, and in this light the language which states that the check shall not be paid "without it bears his (i.e. the depositor-maker's) indorsement" can be understood. In the case at bar, the depositor did direct the bank to pay the named payee, and this was, in fact, done.

Furthermore, the contention based on the last sentence of the quotation above, that the defendant here must show that it paid a "person who, as against the drawer, was legally entitled to receive" the proceeds of the check, is without merit. The situation about which the Court in the Lynch case was speaking would have been exactly the same if no check had ever been issued by the depositor. What the Court meant by the language quoted was that even in such circumstances, if the bank paid the depositor's money to someone who, as against the depositor, had the right to receive it, the depositor could not complain (even though no check had been issued) because he had not been damaged in any respect. It is clear that the language in the Lynch case indicates that even where the check is not technically "issued", the bank is excused under the language of that opinion if it pays a holder who has "acquired in some way the lawful title to receive the funds." A showing that the person paid "as against the drawer, was legally entitled to receive" the funds, is merely one way of showing that he had "lawful title to receive" them. Indeed, the chief distinction between the Lynch case and the case at bar is that in the case at bar the plaintiff's instructions were followed in that the payee was actually paid. Since the plaintiff did not see fit to stop payment on the check, the payee was "lawfully entitled" to receive the funds. The payee's failure to endorse the check could not affect its title. At the time the payee took

possession of the proceeds of the check it had title to the check because the plaintiff intended to give it title. If the payee's title was voidable because of fraud, it, nevertheless, had "lawful title" to receive the funds until the transaction was voided. The bank, therefore, paid a person who had "lawful title" to receive the funds at the time it paid him. As I have already said, the absence of the endorsement does not affect the payee's title. The situation in the Lynch case was different because the Court was concerned with the matter of payment to a holder without endorsement from the payee. Here we are concerned .nerely with payment to the payee itself. There is no intermediate holder involved.

I believe the Lynch case is also authority for the fact that the bank cannot be forced to pay the check to a holder without endorsement of the payee. The case did not determine the liability of a bank which did pay even such a holder. Of course, it is one thing to say that a bank should not be forced to pay money out on a check without the payee's endorsement; it is quite another to say that it should be held liable to the drawer merely because it did so.

Sundail Construction Company v. Liberty Bank, 1938, 277 N.Y. 137, 13 N.E.2d 745, 746, is likewise not a holding for the plaintiff. In that case the plaintiff issued his check drawn on the defendant naming as payee "C. D. Blair". The check was to be deposited by Blair only if he obtained a contract for the plaintiff. The check was given to one Kreppel, who was instructed by Blair to deposit the check in the account of C. D. Blair & Company, Inc., although no contract had been obtained. Kreppel altered the check so that the payee named became C. D. Blair & Company, Inc., and deposited the check in the company's account. In an action against the bank, the Court decided for the plaintiff for two reasons: First, that the alteration rendered the check void under Section 205 of the Negotiable Instruments Law; second, that the defendant was unable to show that C. D. Blair & Company, Inc., was legally entitled to the payment of the check.

Of course, that was true. The corporation was a complete stranger to the transaction. It had no right as against anybody to receive the funds. It was not a case of voidable title in the corporation, but no title whatsoever.

The Court in that case, however, did address itself to the question presented by the case at bar. It said:

"When C. D. Blair received this check payable to his order, it was under a special promise and agreement that he would use it in connection with procuring a contract for the drawer. If he had indorsed the check *or authorized its deposit in his account,* the drawer could not complain because his bank paid it. Although Blair broke his agreement and misappropriated the check, the drawer would have no remedy against his bank, as the check had been paid in due course of banking. The drawer, however, had the right to determine to whom the check should be paid and to whom its bank should give the money. It designated C. D. Blair, and the bank was unauthorized to pay anybody except Blair, *his account,* or the person holding the check by proper indorsement." (Emphasis added.)

In the case at bar the funds were deposited in the account of the named payee, whom the plaintiff now alleges made fraudulent representations upon which he relied. The payee, it is fair to infer, authorized this deposit. Indeed, there has not been any indication in the case otherwise, and under the language of the Blair case the defendant did exactly what it has been instructed to do. The drawer cannot now complain because his bank followed his instructions. This view is reinforced by a line of decisions holding that where the drawee bank pays out funds on the basis of a forged endorsement, but those funds were then later turned over to the named payee, the drawee bank suffers no liability. Sweeney v. National City Bank of Troy, 1942, 263 App.Div. 418, 33 N.Y.S.2d 885; S. Yanowe & Co. v. American Exchange Irving Trust Co., 1929,

234

226 App.Div. 530, 234 N.Y.S. 603; New York Brick & Paving Co. v. Bronx Borough Bank, 1903, 42 Misc. 31, 85 N.Y.S. 557 (Trial Term, Onondaga Cty., 1903). Likewise, Judge Carroll Walter, sitting in the state court with a jury this spring had practically the same case before him as the one at bar. The name of that case is Perlin v. Manufacturers Trust Company, Index No. 394–1951. A portion of that charge has been read into the record in this case, and it appears quite clearly that Judge Walter in that case charged the jury that the defendant bank would be relieved if the jury found that the bank had paid the check according to the plaintiff's instructions. This I have found to be the case here.

The plaintiff has cited the case of Bank of Marshall County v. Boyd, 1948, 308 Ky. 742, 215 S.W.2d 850, as authority. I have read it with care. I do not believe it has any application to the case at bar. Since New York law governs, I have attempted to construe what the New York law is on the subject. While at first blush that case seems to be identical with the case at bar, it differs in that the payee in that case had sold to the drawer stolen goods of which the drawer had no knowledge whatsoever. The payee, therefore, was guilty of larceny in obtaining the check and never received title to it. Furthermore, it seems to me, that decision was based on cases which held that a holder of a check (which is not the case at bar) without endorsement may not enforce payment against the maker where equities exist between the maker and the payee. On the other hand, the defendants have relied upon an Illinois authority which seems to be on all fours with this case, and I refer to the case of Modern Equipment Corporation v. Northern Trust Company, 1936, 284 Ill.App. 586, 1 N.E.2d 105; see also Paton's Digest of Legal Opinions, Vol. 2, p. 2070.

I, therefore, conclude that the defendant has established that it paid the funds to the payee, the party designated by the plaintiff. Defendant's motion to dismiss is accordingly granted.